# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

**Steve Scheffler,**

    **Plaintiff,**

**v.**                                                                                     **Case No. 08-2648-JWL**

**United Parcel Service, Inc.,**

    **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff Steve Scheffler filed this diversity suit against his former employer, United Parcel Service, Inc. ("UPS"), alleging that UPS terminated his employment in retaliation for sustaining a work-related injury and pursuing a workers' compensation claim. This matter comes before the court on defendant's motion for summary judgment (doc. 50). As will be explained, the motion is denied.[1]

## I.     Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Steve Scheffler began working for defendant in 1988 in the part-time loader position. In 1998, plaintiff began working as a full-time package-car

---

[1] Also pending before the court is defendant's motion to strike the affidavit of Jeff Macon (doc. 68). Because the court has determined that plaintiff's evidence is sufficient to survive summary judgment without consideration of Mr. Macon's affidavit, that motion is denied as moot. To be clear, the court has not relied upon Mr. Macon's affidavit in any way in determining that plaintiff has come forward with sufficient evidence to withstand defendant's motion.

driver at defendant's West Center in Lenexa, Kansas. A package car is the familiar brown truck from which most UPS deliveries are made. As a package car driver, plaintiff picked up and delivered packages to UPS customers along a route that he selected through a bidding process pursuant to the collective bargaining agreement between UPS and Local Union 41 of the International Brotherhood of Teamsters–the union that represents the drivers in the Lenexa West Center.

At the Lenexa West Center, defendant's management includes on-road supervisors, a business manager and a division manager. Package-car drivers report to on-road supervisors, who in turn report to the business manager, who reports to the division manager. At all times relevant to this lawsuit, Gary Allen was the division manager for the Lenexa West Center and, beginning in August 2007, Jeff King was the business manager at that facility. Package-car drivers are expected to comply with defendant's safety procedures and delivery methods and any shortcomings in such compliance are typically handled through defendant's progressive discipline policy. The collective bargaining agreement, however, permits defendant to terminate a driver without resorting to progressive discipline for certain offenses such as dishonesty and certain safety-related offenses.

The progressive discipline policy is somewhat flexible in that it permits defendant's managers to exercise their discretion in determining whether to issue the next level of discipline or a lower level of discipline depending on what action the manager believes will serve to correct the behavior of the driver. There are certain limitations on management's discretion, however. For example, a manager may issue the next level of discipline only if the violation is within the

2

same category as the prior "offense." Thus, if a driver is verbally warned for failing to follow proper delivery procedures, then he would be subject to a written warning for a subsequent failure to follow proper delivery procedures. If his next violation, however, was a safety violation and he had no prior safety violations, then he would not properly be subject to a written warning despite the prior verbal warning for the delivery violation. Moreover, in issuing progressive discipline, a manager may consider only those infractions that occurred in the previous nine months. A driver's infractions are documented by a supervisor or manager on the driver's "Form 1000." A driver's Form 1000 identifies the date and nature of the driver's noncompliance and the specific disciplinary action taken (e.g., verbal warning, written warning).

UPS also monitors its drivers' compliance through "on-area observations." On-area observations are generally conducted by on-road supervisors. During an on-area observation, the on-road supervisor observes a driver (without the driver's knowledge) delivering his or her route in an attempt to get an accurate picture of that driver's delivery performance and compliance with safety procedures. Typically, drivers are observed six times each year, but that number may be higher if UPS has safety concerns about a particular driver. During an observation, the on-road supervisor documents on an on-area observation form whether the driver is considered "safe" or "at risk" for various safety-related matters, including the wearing of a seat belt, signaling in traffic, utilizing "only necessary" backing and walking at a brisk pace (as opposed to running) on a clear walkway. Ultimately, the driver is assigned a score or safety percentage based on the on-area observation. The record is devoid of evidence demonstrating how a manager calculates the safety percentage.

3

With this background in mind, the court turns to the particular facts relevant to plaintiff's employment and his claim in this case. On January 9, 2008, plaintiff reported to UPS that his back was hurting and, the following day, he obtained medical treatment for a flare-up of a prior back injury. Plaintiff took medical leave but returned to work as a package-car driver without restrictions on January 16, 2008. Five days later, on January 22, 2008, UPS issued plaintiff an official notice of termination on the grounds that, according to UPS, plaintiff committed a dishonest act by recording that he had made an attempt to pick up a package when, in fact, he did not attempt to pick up the package. Plaintiff filed a grievance concerning the termination decision and that decision was reduced to a one-day suspension. After that time, defendant continued to note various infractions on plaintiff's Form 1000 at a rate that, according to plaintiff, was much more aggressive than it had prior to January 2008.

In April 2008, Gary Allen conducted an on-area observation of plaintiff. According to Mr. Allen, he did not set out to observe plaintiff on that day, but needed to conduct an on-area observation to train other managers on his expectations concerning on-area observations and plaintiff's route was near the Lenexa facility. In any event, Mr. Allen assigned plaintiff a score of only eight percent (8%) safe. Mr. Allen noted that plaintiff was not wearing his seat belt and did not keep the bulkhead door closed as required. He also noted that plaintiff failed to signal in traffic and performed unnecessary backing. Many of the specific categories on the form, however, were not marked as either "safe" or "at risk" and were simply left blank. Indeed, only 5 categories of the 13 categories were marked by Mr. Allen. Plaintiff was issued a written warning for his poor performance during the on-area observation.

On June 26, 2008, plaintiff experienced back pain while delivering packages, notified UPS of his injury and obtained medical treatment. On July 21, 2008, plaintiff returned to work without restrictions as a package-car driver. Two days later, on July 23, 2008, plaintiff's counsel notified UPS via certified mail that plaintiff intended to file a workers' compensation claim arising out of his June 26, 2008 injury. On July 25, 2008, plaintiff filed an application for a hearing with the Division of Workers' Compensation, Kansas Department of Labor, concerning his injury. On July 28, 2008, Mr. Allen conducted another on-area observation of plaintiff, assigned plaintiff a score of twenty-six percent (26%) safe and terminated plaintiff's employment for failure to comply with safety procedures. Plaintiff grieved this decision and the termination was reduced to a suspension. Plaintiff returned to work on August 11, 2008.

UPS terminated plaintiff no less than four times between August 18, 2008 and August 25, 2008. On August 18, 2008, UPS terminated plaintiff's employment for failing to follow the "group 2 exception procedure." A "group 2 exception" package is a package that is returned to the UPS facility for further processing because the package cannot be delivered for some reason such as an incorrect or nonexistent address. A driver with a ground 2 exception package is required to place that package in a designated area of the facility for processing by a clerical employee who then endeavors to get a correct address or otherwise resolve the delivery issue. Defendant alleges that plaintiff, on August 18, 2008, left three group 2 exception packages on his truck instead of placing them in the designated area for such packages and failed to scan four group 2 exception packages. While that termination was pending, Mr. Allen conducted an on-area observation of plaintiff on August 22, 2008 and terminated plaintiff's employment based

5

on his performance during that observation despite the fact that he assigned plaintiff a score of ninety percent (90%) safe. On August 25, 2008, plaintiff was issued another notice of termination for failing to respond correctly to certain safety questions. Later that same day, UPS again terminated plaintiff's employment for failing to follow delivery procedures when he did not attempt to pick up two packages that he was advised to pick up during the day. Because plaintiff failed to timely grieve the termination decision concerning the group 2 exception procedure,[2] that termination became final and effective on September 3, 2008.

Additional facts will be related, as necessary, in connection with the court's analysis of defendant's motion and plaintiff's particular claim.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is

---

[2]Plaintiff does not concede that he did not timely file his grievance. Nonetheless, the timing of his grievance is not pertinent to his claim here so the court need not discuss the facts underlying the filing of that grievance.

essential to the proper disposition of the claim." *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

**III. Analysis**

In the pretrial order, plaintiff sets forth a single claim against defendant–a workers'

compensation retaliatory discharge claim under Kansas law. In analyzing such claims, Kansas courts use a burden-shifting scheme whereby plaintiff is first required to present a prima facie case of retaliatory discharge. *Rebarchek v. Farmers Cooperative Elevator*, 272 Kan. 546, 553 (2001). To establish a prima facie case for retaliatory discharge in the workers' compensation context, plaintiff must establish four elements: (1) he filed a claim for workers' compensation benefits or sustained an injury for which he might assert a future claim for such benefits; (2) defendant had knowledge of plaintiff's claim or injury; (3) defendant terminated plaintiff's employment; and (4) a causal connection exists between the protected activity or injury and the termination of plaintiff's employment. *Id.* at 554. Once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate nonretaliatory reason for terminating plaintiff's employment. *Id.* at 557. If defendant does so, the burden shifts back to plaintiff to present evidence tending to show that defendant's proffered reason for terminating plaintiff's employment is pretextual. *Id.* If plaintiff comes forward with evidence that raises genuine issues concerning defendant's motivation, then "he is entitled to test his case before a jury." *Id.* at 558.

Defendant moves for summary judgment on the grounds that plaintiff cannot establish a prima facie case of retaliatory discharge because plaintiff lacks evidence of any causal connection between his protected activity or injury and defendant's decision to terminate plaintiff's employment and, in any event, plaintiff cannot establish that defendant's proffered reason for terminating plaintiff's employment is pretextual. As will be explained, the court concludes that plaintiff has presented evidence sufficient to establish the requisite causal

connection for purposes of his prima facie case and has presented evidence of pretext sufficient to warrant a jury trial on his claim.

A. *Causal Connection*

In support of its argument that plaintiff lacks evidence of any causal connection between his claim or injury and the termination of his employment, defendant first explains at length that the decision to terminate plaintiff's employment stemmed solely from plaintiff's performance-related problems. According to defendant, no reasonable jury could find a causal connection between plaintiff's claim or injury and the termination decision in light of defendant's overwhelming evidence that plaintiff's termination–consistent with the progressive discipline policy provided for in the collective bargaining agreement that governed plaintiff's employment–was simply the culmination of plaintiff's escalating number of performance-related problems.

The Kansas Supreme Court, however, has expressly rejected the approach taken by defendant. In *Rebarchek*, the defendants, like defendant here, argued that the plaintiff's poor job performance precluded him from establishing the causal connection element of his prima facie case. *Id*. at 557. Reiterating that a plaintiff's prima facie case "is not an onerous burden," the court stated that "evidence of the claimant's job performance, negative and positive, is not a part of his or her prima facie case but rather is the subject of the employer's proof and the plaintiff's response." *Id*. Thus, this court cannot consider, at the prima facie stage, defendant's evidence concerning plaintiff's performance problems.

Defendant next contends that plaintiff cannot establish the requisite causal connection because both the seven-month period between his January 2008 injury and his August 2008 termination and the two-month period between his June 2008 injury and his August 2008 termination are too temporally remote to support an inference of causation. Defendant's time table, however, ignores certain significant events–namely, defendant's decisions to terminate plaintiff's employment in January 2008 and July 2008. When the causation element is analyzed through this wider lens, the temporal proximity between plaintiff's protected activity and the decision to terminate plaintiff's employment is much closer and gives rise to the necessary inference of retaliatory motive.

Defendant first terminated plaintiff's employment on January 22, 2008–less than two weeks after his January 9, 2008 injury and less than one week after he returned to work from that injury. Although that termination was ultimately reduced to a one-day suspension through the grievance procedure, the fact that defendant made the decision to terminate plaintiff's employment less than two weeks after his injury is nonetheless indicative of an unlawful motive. *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (temporal proximity of two weeks between termination and protected activity is alone sufficient to establish causal connection for purposes of prima facie case of retaliation); *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007) (three-week gap between protected activity and adverse action is sufficient to infer requisite causation); *White v. Tomasic*, 31 Kan. App. 2d 597, 603 (2003) (three-week gap sufficient to establish causation element in context of workers'

compensation retaliation claim).[3]

Defendant terminated plaintiff's employment again on July 28, 2008–approximately one month after his June 26, 2008 injury, just one week after plaintiff returned to work from that injury and only five days after plaintiff's counsel provided notice to defendant that plaintiff intended to pursue a workers' compensation claim. *See Annett v. University of Kansas*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (one-month gap between protected activity and adverse action sufficient to establish causation element of prima facie case).[4] While this termination, too, was reduced to a suspension through the grievance procedure, the timing of defendant's decision to terminate again suggests a retaliatory motive. Finally, defendant terminated plaintiff's employment no less than 4 times in August 2008–beginning just one week after plaintiff returned

---

[3]Because the Kansas Supreme Court has expressly looked to Tenth Circuit decisions for guidance concerning the acceptable period of time between a plaintiff's protected activity and an adverse action, the court is comfortable doing so here. *See Rebarchek v. Farmers Cooperative Elevator*, 272 Kan. 546, 554-55 (2001).

[4]Defendant does not controvert that plaintiff's counsel, on July 23, 2008, notified defendant that plaintiff intended to file a workers' compensation claim. Nonetheless, in reply to that specific statement of fact, defendant states that it is "immaterial" because there is no evidence that Mssrs. King or Allen knew about the notification. The court is not persuaded by this argument.

First, the certified letter from plaintiff's counsel was mailed to the facility where Mssrs. King and Allen are employed as defendant's highest ranking officers. Moreover, nowhere in its briefing does defendant suggest that Mssrs. King and Allen did not have knowledge of plaintiff's intent to pursue a workers' compensation claim. Thus, while these individuals may not have had knowledge of plaintiff's claim on July 23, 2008, it is reasonable to infer that they had knowledge of that claim shortly thereafter (i.e., if not before their July 28, 2008 termination decision, then before their decision to terminate plaintiff's employment no less than three times in August 2008). In any event, even if they did not have knowledge of the claim at the time of the July 28, 2008 termination decision, the proximity of plaintiff's injury and return to work from that decision is still sufficient to infer causation.

to work from his July 28, 2008 termination. The court is satisfied that plaintiff has established the causation element of his prima facie case.

## B. Pretext

Because plaintiff has established his prima facie case, defendant must articulate a legitimate, nonretaliatory reason for terminating plaintiff's employment. *See Gonzalez-Centeno v. North Central Kansas Regional Juvenile Detention Facility*, 278 Kan. 427, 439-40 (2004). According to defendant's evidence, defendant terminated plaintiff's employment based on plaintiff's repeated violations of defendant's policies and procedures. Defendant has satisfied its burden of production and the burden shifts back to plaintiff to demonstrate a genuine dispute of material fact as to whether defendant's stated reason is unworthy of belief. *Id*. at 440. As will be explained, the court concludes that plaintiff has come forward with specific facts establishing a triable issue as to whether defendant's proffered reason for his termination is a pretext for retaliatory discharge.

The court begins an analysis of plaintiff's pretext evidence with the timing of defendant's numerous efforts to terminate plaintiff's employment–timing which the court has set forth in connection with the causation element of plaintiff's prima facie case. As explained above, the timing between plaintiff's January 2008 injury in this case and his January 2008 termination is evidence of a retaliatory motive. Similarly, the timing between his June 2008 reinjury/July 2008 pursuit of his worker's compensation claim and his July 2008 and August 2008 terminations is indicative of a retaliatory motive. While temporal proximity alone is insufficient to raise a

genuine issue of material fact concerning pretext under Kansas law, evidence of temporal proximity may be considered in analyzing pretext. *See Proctor v. United Parcel Service*, 502 F.3d 1200, 1213 (10th Cir. 2007) (applying Kansas law). Here, plaintiff's evidence of temporal proximity, combined with other evidence of pretext described below, is sufficient to create a reasonable inference that defendant's asserted reasons are unworthy of belief.

Plaintiff has come forward with evidence that defendant, in deciding to terminate plaintiff based on his group 2 exception procedure infraction, treated plaintiff much more harshly than it treated other drivers who committed the same infraction–an infraction that defendant concedes is not serious. *See Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (a common method of proving pretext is by providing evidence that the employer treated the plaintiff differently from other similarly situated employees who violated work rules of comparable seriousness in order to show that the employer failed to follow typical company practice in its treatment of the plaintiff). Plaintiff's evidence, for example, demonstrates that driver Elijah James, in December 2008, had a group 2 exception procedure infraction but did not receive a warning letter, suspension letter or termination letter from Mr. King despite the fact that he had eight delivery procedure infractions in the nine-month period leading up to December 2008. While defendant asserts that the comparison is meaningless because plaintiff has no evidence of Mr. James' work-related injury history, defendant itself has come forward with that evidence in its opening brief. According to defendant's evidence, Mr. James last reported an injury in 2000–long before Mssrs. Allen and King came to the Lenexa West Center.

During this same time frame, driver Rusty Yinger also had a group 2 exception procedure

13

violation–his fifth group 2 exception procedure violation in a nine-month period. Mr. Yinger did not receive a warning letter, suspension letter or termination letter from Mr. King. According to defendant's evidence, Mr. Yinger has never reported a work-related injury. Similarly, in August 2008, driver Chris Beard was issued a warning letter by Mr. King for a group 2 exception procedure violation. Mr. Beard was not terminated despite the fact that he had 15 delivery procedure infractions in the nine-month period leading up to August 2008. Mr. Beard has never reported a work-related injury. Another driver, Evan Harris, had 25 delivery procedure infractions leading up to his group 2 exception procedure violation in June 2008. Mr. Harris did not receive a warning letter, suspension letter or termination letter for the violation. He has never reported a work-related injury.

While defendant goes to some length to parse the differences between plaintiff's disciplinary history and the histories of these individuals, plaintiff's evidence is sufficient to permit an inference that plaintiff was treated more harshly by defendant for his group 2 exception violation and that plaintiff's injury or workers' compensation claim may have motivated that harsher treatment, particularly when the timing of defendant's decision is measured from the time of plaintiff's injury and his notifying UPS of his intent to file a claim. Of course, a reasonable jury may well determine that defendant's evidence concerning the differences in disciplinary histories is persuasive and that, as a result, defendant in fact terminated plaintiff because of the group 2 exception procedure infraction. The point is that a jury must evaluate and weigh the evidence–not this court.

Plaintiff's pretext evidence is further buttressed by evidence that the manner in which

14

defendant conducted plaintiff's on-area observations was inconsistent with the manner in which defendant conducted on-area observations of other drivers. *See Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1191 (10th Cir. 2007) (pretext may be established by evidence that the defendant acted contrary to company practice with respect to plaintiff); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002) (deviations from normal company procedure can support pretext argument). In that regard, the evidence demonstrates that Gary Allen–the highest ranking officer at the Lenexa West facility–conducted four on-area observations of plaintiff in 2008. While the number of on-area observations of plaintiff is not unusual, plaintiff's evidence is sufficient to demonstrate that the fact that Gary Allen participated in the observations was unusual. Mr. King testified that on-area observations are conducted by on-road supervisors. In addition, George Young, the union steward at the facility, testified that it was "out of the ordinary" for Mr. Allen to conduct an observation of a driver and that he was not aware of any other time when Mr. Allen had participated in an on-area observation of a driver. While defendant contends that Mr. Young has no personal knowledge of Mr. Allen's conduct, it is reasonable to infer that the union steward at UPS's Lenexa West facility would have sufficient knowledge and experience through participation in the grievances of union members to testify about this subject. Moreover, defendant's evidence suggests that Mr. Allen participates in on-area observations only for purposes of training other managers concerning the appropriate manner in which to conduct on-area observations.

To be sure, the evidence concerning Mr. Allen's participation in plaintiff's on-area observations might not be sufficient, standing alone, to cast doubt on defendant's proffered

15

reasons for the decisions it made with respect to plaintiff's employment. But when viewed in the context of other evidence in the record, the evidence helps to support an inference that defendant, as a result of plaintiff's injury and pursuit of a workers' compensation claim, aggressively sought to find reasons to terminate plaintiff's employment. By way of another example, Mr. Allen terminated plaintiff's employment (one of four terminations in a one-week period) based on one of the on-area observations he conducted. Curiously, the observation that led to plaintiff's August 22, 2008 termination was one in which plaintiff received a score of ninety percent (90%) safe. Indeed, Mr. Allen noted that plaintiff was "safe" in numerous categories, including wearing his seat belt, keeping the bulkhead door closed and handling intersections properly. The only "at risk" notations on the form include one occasion when plaintiff did not identify the best route and a handful of occasions when plaintiff did not communicate in traffic properly. In the comment portion of the form, Mr. Allen noted only that plaintiff did not set the emergency brake at all stops, did not always signal his intentions when pulling away from the curb and would walk while performing other tasks without rechecking his walk path.

Despite the fact that this observation demonstrated a dramatic improvement in plaintiff's safety-related conduct, and the fact that Mr. Allen avers that he conducted the August 2008 observation "to ensure that [plaintiff] had corrected his poor performance," Mr. Allen terminated plaintiff's employment based on the observation. Standing alone, the fact that plaintiff was terminated for achieving a 90% safety rating seems highly unusual. But the record contains other evidence that would permit a jury to find the termination decision suspect (aside from the

16

fact that the decision was made on the heels of a prior discharge decision that was made within one week of plaintiff returning to work after a prior discharge decision that was made within days of plaintiff notifying UPS of his intent to file a claim). In that regard, Tony Wolfer, another driver, received a 90% safety rating during an observation that was conducted in September 2008. Mr. Wolfer was not terminated. Rather, he was praised for his "commitment towards safety" and his supervisor commented that his performance was "much improved." Just two weeks prior to that observation, Mr. Wolfer had been given a 70% safety rating during another observation for which he received a verbal warning. Unlike plaintiff, Mr. Wolfer has not reported an injury since 1996.

Defendant asserts that a comparison between plaintiff and Mr. Wolfer is not appropriate for several reasons. First, defendant argues that Mr. Wolfer's observation did not involve the same conduct because Mr. Wolfer was not cited for unnecessary backing. But plaintiff similarly was not cited for unnecessary backing in his August 2008 observation. That category was left blank by Mr. Allen. Indeed, both individuals were cited for failing to communicate properly in traffic. Defendant also contends that a comparison is improper because Mr. Allen did not conduct the observation of Mr. Wolfer. While this argument is ordinarily well taken, the argument fails here because the fact that Mr. Allen conducted the observation at all is unusual and defendant admittedly strives for consistency with respect to observations regardless of which supervisor conducts the observation. Finally, defendant urges that the disciplinary histories of plaintiff and Mr. Wolfer are too different to permit a proper comparison. While defendant is certainly free to explain these differences to a jury, plaintiff, at this stage, has come forward with

17

sufficient evidence for a jury to conclude that something other than plaintiff's safety record factored into the termination decision.

Defendant contends that plaintiff, despite the evidence set forth above, cannot establish that defendant's proffered reasons are pretextual because defendant began disciplining plaintiff for safety and delivery infractions before his injuries and workers' compensation claim. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324-25 (10th Cir. 1997) (no inference of pretext where discipline "simply completed the disciplinary process already set in motion"). A careful review of defendant's history of disciplining plaintiff, however, actually supports plaintiff's pretext argument. From the time that Mr. King came to the Lenexa West Center in August 2007 to the time that plaintiff sustained his injury in January 2008, plaintiff's Form 1000 reflects only four disciplinary notations, with no written warnings, suspensions or terminations. From the time of plaintiff's injury in January 2008 through his effective termination on September 3, 2008, plaintiff's Form 1000 reflects 22 disciplinary notations, plus three warning letters, a handful of suspensions and six terminations. The record, then, does not support defendant's argument that it had consistently disciplined plaintiff long before his January 2008 injury and that his termination was somehow just the culmination of a process that had started prior to January 2008.

Finally, defendant contends that plaintiff is precluded from arguing that defendant was motivated by his injuries or workers' compensation claim because he "admitted" in his deposition that the two decisionmakers--Mssrs. King and Allen–were not motivated by his injury or workers' compensation claim in disciplining plaintiff or terminating plaintiff's employment.

The court disagrees with defendant's characterization of plaintiff's testimony. To begin, plaintiff clearly testified as to his belief that Mssrs. King and Allen retaliated against him on the basis of his injury and/or workers' compensation claim. Elaborating on that belief, he further testified to his belief that neither Mr. King nor Mr. Allen, acting alone, would have terminated plaintiff based on his injury or claim but that "somewhere up the ladder" he had been deemed a "problem" based on his injury or claim such that Mssrs. King and Allen carried out defendant's plan to remove plaintiff from the workplace. In short, plaintiff's testimony is not inconsistent with his assertion in this lawsuit that defendant terminated his employment based on his injury or workers' compensation claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc.50) is denied. Defendant's motion to strike the affidavit of Jeff Macon (doc. 68) is denied as moot.

**IT IS SO ORDERED.**

Dated this 29th day of January, 2010, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

19